IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 3:15-cr-00164-B |
| FOLUKE ADOEYE (01) | |

FACTUAL RESUME

The defendant, **Foluke Adoeye**, her attorney, William R. Biggs, and the United States of America agree that the following accurately states the elements of the offense and the facts relevant to the offense to which the defendant is pleading guilty.

ELEMENTS OF THE OFFENSE

To prove the offense of Conspiracy to Commit False Statements Related to Health Care Matters, in violation of 18 U.S.C. § 371 (18 U.S.C. § 1035(a)(2)) as alleged in Count One of the indictment, the government must prove each of the following elements beyond a reasonable doubt:

The elements of 18 U.S.C. § 371 are as follows:

*First:* That the defendant and at least one other person made an agreement to commit the crime of false statements relating to health care matters in violation of 18 U.S.C. § 1035(a)(2), as charged in the indictment;

*Second:* That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with intent to further the unlawful purpose; and

*Third:* That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the

indictment in order to accomplish some object or purpose of the conspiracy.

The elements of 18 U.S.C. § 1035(a)(2) are as follows:

*First*: The defendant knowingly and willfully made or caused to be made a materially false, fictitious, or fraudulent statement or representation and used a materially false writing and document;

*Second*: That the materially false, fictitious, or fraudulent statement or representation and the materially false writing and document were made and used in a matter involving a health care benefit program.

*Third*: That the materially false, fictitious, or fraudulent statement or representation and the materially false writing and document were made and used in connection with the delivery of and payment for health care benefits, items, and services and that the defendant knew, in a general sense, that the defendant's conduct was unlawful; and

*Fourth:* The health care benefit program affected or could have affected interstate commerce.

## STIPULATED FACTS

The Defendant stipulates that the following facts are true and correct, and waives any objection under Federal Rule of Evidence 410 to the use of these Stipulated Facts against her in any proceeding.

### The Medicare Program Generally

1. The Medicare Program (Medicare) was a federal health care program providing benefits to persons who were over the age of 65 or disabled. Individuals receiving benefits through Medicare were referred to as Medicare "beneficiaries."

2. Medicare was a "health care benefit program" as defined by 18 U.S.C. § 24(b), that affected commerce, and as that term is used in 18 U.S.C. § 1035.

3. Medicare paid for certain home health care services, which were medically necessary and covered by the Medicare program.

4. According to 42 CFR § 409.42, for home health care services to be covered and therefore compensable by Medicare, all of the following requirements had to be met:

   (a) The beneficiary must have been confined to the home or an institution that is not a hospital or nursing facility (i.e., homebound);

   (b) The beneficiary must have been under the care of a physician who establishes the plan of care;

   (c) The beneficiary must have been in need of skilled services such as intermittent skilled nursing services, physical therapy, speech-language pathology services, or continuing occupational therapy services;

   (d) The beneficiary must have been under a plan of care that meets the requirements specified in 42 CFR § 409.43; and

   (e) The home health care services must have been provided by, or under arrangements made by a participating home health care agency.

5. In order for a patient to be eligible to receive covered home health care services by Medicare, the law required that a physician certify in all cases that the patient was confined to their home. The condition of the patients should have been such that there existed a normal inability to leave home and, consequently, leaving home would have required a considerable and taxing effort. If a patient did in fact leave the home, the patient may nevertheless have been considered homebound if the absences from the home were infrequent or for periods of relatively short duration, or were attributable to the need to receive health care treatment.

6. Medicare compensation to home health care agencies was based on the Prospective Payment System (PPS). Under this system, Medicare paid a home health care agency a base payment, which was adjusted based on the severity of the beneficiary's health condition and care needs. The PPS payment provided home health care agencies with payments for each 60-day episode of care for each beneficiary. If the beneficiary was still eligible for home health care after a home health episode, they may have been recertified for another 60-day home health episode. There was no limit to the number of home health episodes that a beneficiary could receive.

7. To obtain reimbursement from Medicare for home health care services provided to beneficiaries, home health care agencies were required to submit claims either electronically or on a standardized form. Whether an agency submitted claims electronically or on paper, the agency agreed and was required to submit claims that were accurate, complete, and truthful.

## Paradise Home Health Agency

8. Paradise Home Health Agency (Paradise) was an approved home health agency in the Medicare system.

9. Paradise submitted false and fraudulent claims to Medicare for home health care services on behalf of Medicare beneficiaries who were not homebound or otherwise eligible for home health care service.

10. Paradise paid cash to Medicare beneficiaries, many of whom were not homebound or otherwise eligible for home health care services, to recruit and retain them as patients.

## The Defendants

11. **Foluke Adeoeye (Mrs. Adeoye)**, a resident of Arlington, Texas, was a registered nurse who worked at Paradise.

12. Ayitey Ayayee-Amim (Amim), a resident of Irving, Texas, worked at Paradise from approximately the summer of 2010 to the fall of 2011.

13. Michael Umunnakwe (Umunnakwe), a resident of Grand Prairie, Texas, worked at Paradise from approximately late 2012 to June 2014, first as an office clerk and later as a certified nurse's aide.

14. Elizabeth Uwagboi-Ugbeche (Ugbeche), a resident of Grand Prairie, Texas, worked at Paradise from approximately the spring of 2010 through October 2014. Ugbeche, a registered nurse, served in various roles at Paradise including quality assurance, field nurse, and Director of Nursing.

15. OlusolaAderemi Akingbade (Akingbade), a resident of Grand Prairie Texas, worked at Paradise from approximately the spring of 2011 through October 2014. Akingbade, a registered nurse, served in various roles at Paradise including field nurse and Director of Nursing.

Coconspirators Not Named as Defendants

16. Theophilus Adeoye (Mr. Adeoye), a resident of Arlington, Texas, owned and operated Paradise.

17. Stacey Shephard (Shephard), a resident of Fort Worth, Texas, was an employee of Paradise from approximately April 2010 to 2013. Shephard's job responsibilities included, among other things, driving Mr. Adeoye to patients' homes, taking patients' vital signs, giving cash to patients, and completing paperwork, often with false information.

18. From in or around January 2009, through in or around October 2014, in the Dallas Division of the Northern District of Texas and elsewhere, **Mrs. Adeoye**, Amim, Umunnakwe, Ugbeche, and Akingbade, together with their coconspirators Mr. Adeoye and Shephard, who are not named as defendants in this indictment, did knowingly and willfully combine conspire, confederate and agree with each other, and with others to commit certain offenses against the United States, in that the defendants and their coconspirators knowingly and willfully agreed to make, or cause to be made, materially false, fictitious, and fraudulent statements and representations, and to make and use materially false writings and documents, knowing the same to contain materially false, fictitious, and fraudulent statements in connection with the payment of health care

benefits, items, and services by Medicare, a health care benefit program as defined by 18 U.S.C. § 24(b), that affected commerce, in violation of 18 U.S.C. § 1035(a)(2).

## Objects of the Conspiracy

19. It was an object of the conspiracy for Mr. Adeoye and his coconspirators to unlawfully enrich themselves through the submission of false and fraudulent Medicare claims for home health care services that were medically unnecessary and for services that were not provided, and to conceal these facts from Medicare. Between September 12, 2009 and July 31, 2014, Mr. Adeoye caused Paradise to submit claims to Medicare for home health care services in the amount of $4,009,734.19. Paradise was paid $4,027,115.40 for these claims.

## Manner and Means of the Conspiracy

20. The manner and means by which Mr. Adeoye and his coconspirators sought to accomplish the purpose of the conspiracy included, among other things:

21. Mr. Adeoye and his coconspirators worked together to enroll Medicare beneficiaries as patients of Paradise. Mr. Adeoye and his coconspirators knew that many of the beneficiaries enrolled as patients of Paradise were not homebound and not otherwise eligible to receive Medicare-covered home health care. Mr. Adeoye and his coconspirators created paperwork with false information in order to enroll these patients.

22. Mr. Adeoye and his coconspirators paid cash kickbacks to Medicare beneficiaries to recruit and retain them as patients of Paradise. Mr. Adeoye instructed his coconspirators, including **Mrs. Adeoeye**, Amim, Umunnakwe, and Shephard to make these payments. At times, Mr. Adeoye made the payments himself. In each case,

Factual Resume - Page 7

Mr. Adeoye determined how much each patient should be paid and how often. Patients were typically paid $200 upon enrollment with Paradise and $40 twice per month thereafter. Mr. Adeoye and his coconspirators instructed the Medicare beneficiaries not to tell anyone about these cash payments and to avoid talking about the payments over the telephone.

23. Mr. Adeoye and his coconspirators worked together to create documents with false information to support and justify the claims Paradise submitted to Medicare. Mr. Adeoye and his coconspirators used these documents to support claims submitted on behalf of individuals who were not homebound or otherwise eligible to receive Medicare covered home health care services, as well as to support claims for services that were not provided and for services that were not provided by requisitely licensed and qualified individuals. Mr. Adeoye and his coconspirators referred to this process as "quality assurance."

24. Mr. Adeoye and his coconspirators frequently falsified patient records to indicate that Mr. Adeoye had provided home health care services to patients, when in fact, Mr. Adeoye had not provided those services because he was sleeping in the car or in Nigeria on vacation, among other reasons.

25. As part of the false and fraudulent billing process, Ugbeche performed quality assurance checks on patient files for patients she knew were not homebound or otherwise eligible to receive Medicare covered home health care services.

26. As part of the false and fraudulent billing process, Akingbade certified and recertified patients as homebound knowing that the patients were not homebound or

otherwise eligible to receive Medicare covered home health care services. At times, Akingbade would complete such paperwork without actually visiting the patient.

27. As part of the false and fraudulent billing process, Mr. Adeoye instructed Amim and two of Mr. Adeoye's minor children to fabricate nursing notes and to perform quality assurance checks on patient files.

## Overt Acts in Furtherance of the Conspiracy

28. In furtherance of the conspiracy and to effect its objects, the following overt acts, among others, were committed in the Dallas Division of the Northern District of Texas and elsewhere, by at least one coconspirator:

29. On or about December 10, 2013, **Mrs. Adeoye** gave $40.00 cash to E.E. at Mr. Adeoye's direction. E.E. was not homebound or otherwise eligible for Medicare covered home health care.

30. On or about March 12, 2014, Mr. Adeoye caused Paradise to submit a claim to Medicare for a 60-day home health care services episode from December 19, 2013 to February 16, 2014 on behalf of E.E. in the amount of $2,014.57.

31. **Mrs. Adeoye** knew that many patients of Paradise were not homebound or otherwise eligible to receive Medicare covered home health care.

//

//

//

//

//

32. At the direction of Mr. Adeoye, **Mrs. Adeoye** paid patients of Paradise when Mr. Adeoye was out of town.

All in violation of 18 U.S.C. § 371 (18 U.S.C. §1035(a)(2)).

AGREED TO AND SIGNED this 14th day of September, 2015.

JOHN R. PARKER
UNITED STATES ATTORNEY

_____
FOLUKE ADOEYE
Defendant

_____
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8604
Facsimile: 214-659-8802
douglas.brasher@usdoj.gov

_____
WILLIAM R. BIGGS
Counsel for Defendant